STATE OF NEBRASKA EX REL. COUNSEL FOR DISCIPLINE
OF THE NEBRASKA SUPREME COURT, RELATOR, V.
ALICE L. ROKAHR, RESPONDENT.

675 N.W.2d 117

Filed February 27, 2004.   No. S-02-560.

Kent L. Frobish, Assistant Counsel for Discipline, for relator.

John Thomas for respondent.

HENDRY, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

## INTRODUCTION

The office of the Counsel for Discipline of the Nebraska Supreme Court filed formal charges against respondent, Alice L.

Rokahr. After a formal hearing, the referee concluded that Rokahr had violated the Code of Professional Responsibility and recommended a suspension of 6 months. Rokahr filed exceptions to the referee's findings and recommended sanction.

## FACTUAL BACKGROUND

Rokahr was admitted to the practice of law in the State of Nebraska on July 15, 1988. Rokahr is also licensed to practice law in the State of South Dakota. The charges in this case arise from Rokahr's representation of Clara Heine and her son Allen Heine.

Clara's husband, Alphonse Heine, was a farmer and cattle feeder. Alphonse and Clara owned land in Cedar County, Nebraska, and Yankton County, South Dakota. Alphonse and Clara had three children: Mary Frances Arens, Leon Heine, and Allen. Allen and Leon were involved with Alphonse in the family business, the Heine Feedlot Company. Alphonse passed away on September 1, 1984, Clara on April 1, 2002.

Allen and his wife, Marilyn Heine, have six children. Leon and his wife, Arlene Heine, have three children: Paula Heine Fejfar, Rebecca Heine, and Justin Heine.

On June 6, 1974, Alphonse created two trusts: one for Paula and one for Rebecca. The respective terms of the trusts gave Paula and Rebecca the option to terminate their trusts upon attaining 21 years of age "and for six months thereafter." If either chose not to terminate their respective trusts at that time, the trusts would automatically terminate upon their attaining 25 years of age and the assets would be distributed. These trusts named Allen, Paula and Rebecca's uncle, as trustee, and Mary Frances, their aunt, as successor trustee. Paula's trust terminated on her 25th birthday, September 18, 1994; Rebecca elected to terminate her trust on her 21st birthday, February 21, 1995.

The two trusts were initially funded with an equal share of land in Cedar County known as the Gust ground. The Gust ground was deeded by Alphonse and Clara to Allen as trustee for Paula and Rebecca. No one disputes that Paula and Rebecca are the only intended beneficiaries of the Gust ground in Cedar County.

On July 21, 1977, Alphonse and Clara began deeding land in Yankton County, known as the East Larson ground, to Allen as trustee for Paula and Rebecca. Alphonse and Clara initially

deeded seven twenty-fifths of the East Larson ground, with the remaining eighteen twenty-fifths transferred to Allen as trustee as follows: one-fifth interest on December 20, 1978, one-fifth interest on January 22, 1979, one-fifth interest on December 30, 1980, and three twenty-fifths interest on December 23, 1981. On December 31, 1982, an additional one-half interest in the East Larson ground was deeded by Alphonse and Clara to Allen as trustee for Paula and Rebecca. At the time of the 1982 deed, however, all of Alphonse and Clara's interest in the East Larson ground had previously been transferred.

The intent of the 1977, 1981, and 1982 deeds was memorialized with receipts and declarations signed by Allen acknowledging that the land was conveyed to Allen for Paula and Rebecca and that Allen "holds one-half of the interest so conveyed to him" under trust agreements dated April 6, 1976. Although the record does not disclose the existence of any trust dated April 6, 1976, no one appears to dispute that the trusts referenced were those created on June 6, 1974, and we will treat the matter in such fashion. The record contains no receipts or declarations for the 1978, 1979, or 1980 transfers.

On December 23, 1981, Clara created a trust for Justin, who was born on August 14, 1979. Allen was again named trustee, with Arlene, Justin's mother, named successor trustee. Alphonse and Clara, as grantors, deeded an interest in land in Cedar County, known as the Wueben pasture, to Allen as trustee for Justin. There is no dispute that Justin is the only intended beneficiary of the Wueben pasture in Cedar County.

Trusts were also created for five of Allen's six children. The only asset deeded to these trusts for the benefit of Allen's children relevant to our inquiry is land known as the West Larson ground in Yankton County, which abuts the East Larson ground that Allen held in trust for Paula and Rebecca. Allen's brother, Leon, was the initial trustee for each of these five trusts until his resignation on July 10, 1990. Thereafter, by the respective terms of the trusts, Allen and Leon's sister, Mary Frances, became trustee for three of the children, while Allen's wife, Marilyn, became trustee for the other two children.

The record indicates that all of the land deeded in trust to Allen and Leon was used in the operation of the Heine Feedlot

Company. All of the rental income from the lease of these properties was deposited into a single account with no specific accounting as to its individual beneficiaries. The record further indicates that at least with respect to Leon's three children, the profits from the land were generally divided equally between the children.

Following Alphonse's death, Rokahr began representing Clara, both individually and in her capacity as personal representative of Alphonse's estate. Rokahr also represented Allen individually in his capacity as trustee of the three trusts involving Paula, Rebecca, and Justin, and as controlling partner of Heine Feedlot Company.

During the course of Rokahr's representation of Allen as trustee, a concern arose that the deeds purporting to convey the real estate to the three trusts were invalid due to the absence of an ascertainable trust beneficiary. As a result, Rokahr prepared corrective warranty deeds for the East Larson and Gust grounds and the Wueben pasture, which deeds were signed on March 23, 1994. The corrective warranty deeds named Paula and Rebecca as beneficiaries of the Gust ground, Justin as beneficiary of the Wueben pasture, and all three children as beneficiaries of the East Larson ground. The East Larson corrective deeds were filed with the register of deeds for Yankton County on March 24. The Gust ground and Wueben pasture deeds were filed with the register of deeds for Cedar County on September 16 and October 11, respectively. Also in connection with her representation of Allen as trustee, Rokahr prepared an easement for Allen's signature, granting a perpetual right of ingress and egress across the East Larson ground to the benefit of the West Larson ground which would otherwise be "landlocked." The trust beneficiaries of the West Larson ground were five of Allen's children. That easement was dated September 1, 1994, but was not recorded with the register of deeds for Yankton County until March 6, 1995.

## FORMAL CHARGES

Formal charges were filed against Rokahr in this court on Mary 22, 2002, alleging she violated the following provisions of the Code of Professional Responsibility:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

. . . .

(6) Engage in any other conduct that adversely reflects on his or her fitness to practice law.

. . . .

DR 7-102 Representing a Client Within the Bounds of the Law.

(A) In his or her representation of a client, a lawyer shall not:

. . . .

(5) Knowingly make a false statement of law or fact.

(6) Participate in the creation or preservation of evidence when the lawyer knows or it is obvious that the evidence is false.

(7) Counsel or assist a client in conduct that the lawyer knows to be illegal or fraudulent.

The Counsel for Discipline contends, inter alia, that Rokahr's conduct violated the Code of Professional Responsibility in the following particulars: (1) preparing a corrective warranty deed granting Justin an interest in the East Larson ground when (a) Rokahr knew or should have known that Justin was not intended to have any interest in the East Larson ground, (b) Rokahr's preparation of the corrective warranty deed was in furtherance of Allen's desire to retain a measure of control over the East Larson ground for a minimum of an additional 6 years, or until August 14, 2000, when Justin "attain[ed] twenty-one years of age," and (c) it was improper for Rokahr to assist Allen in such manner, since Allen's conduct violated his fiduciary duties to Paula and Rebecca; (2) preparing the easement with a date of September 1, 1994, when the easement was actually prepared and signed sometime after February 22, 1995, when Paula's and Rebecca's trusts had terminated and Allen no longer had legal authority to act on their behalf; (3) falsely swearing that Rokahr witnessed Allen's

acknowledgment of the easement on September 1, 1994, thereby assisting Allen in committing a fraud in violation of Allen's fiduciary duty to Paula and Rebecca; (4) violating the laws of the State of South Dakota by falsely swearing that Rokahr witnessed Allen's acknowledgment of the easement on September 1, 1994; (5) delaying the transfer of the Gust and East Larson grounds to Paula and Rebecca, even though Rokahr was aware of Allen's obligation to deed the land to Paula on September 18, 1994, and to Rebecca on February 21, 1995; (6) delaying until December 23, 1994, to advise anyone of the preparation and filing of the corrective warranty deed conveying to Justin an interest in the East Larson ground despite the filing of the deed on March 23, 1994; and (7) informing Leon's family, through their attorney, that if they believed that Justin should not have an interest in the East Larson ground, Rokahr would amend the deed, but refusing to do so when such action was requested.

In summary, the Counsel for Discipline argues that the above-enumerated conduct was undertaken by Rokahr in furtherance of Allen's effort to retain a measure of control over the East Larson ground when such control had ended due to the termination of Paula's trust on September 18, 1994, and Rebecca's trust on February 21, 1995. The Counsel for Discipline further contends that once this purported conduct was suspected, Rokahr failed to timely respond to requests for information and the documents needed to explain such conduct and, if necessary, to correct it.

## REFEREE'S FINDINGS

A referee was appointed to conduct a hearing in this matter. In a 56-page report filed March 7, 2003, the referee found there was clear and convincing evidence that Rokahr had violated the Code of Professional Responsibility by (1) backdating the easement over the East Larson ground; (2) colluding with Allen in backdating and filing the easement over the East Larson ground; and (3) engaging in delay, deceit, and deception in the delivery of deeds to Paula and Rebecca. In connection with these findings, the referee concluded that Rokahr had violated Canon 1, DR 1-102; Canon 7, DR 7-102 and DR 7-104; and Neb. Rev. Stat. §§ 7-104 and 7-106 (Reissue 1997). In his report, the referee states that Rokahr "has been unwilling to take responsibility for her actions

and has not, in much of her testimony, been candid or forthright in her explanations for her actions" and that Rokahr's "conduct was not isolated to a single incident, but consisted of a series of cumulative acts of misconduct." The referee recommended that Rokahr be suspended from the practice of law for 6 months.

## ASSIGNMENTS OF ERROR

Rokahr filed exceptions to the referee's report alleging, renumbered and restated, that (1) Rokahr has already been disciplined in this matter by the State of South Dakota, thus any Nebraska discipline "disrespects South Dakota jurisdiction and sovereignty; disregards the principles of due process, full faith and credit, collateral estoppel, and res judicata; and generally overreaches the proper boundaries of Nebraska jurisdiction"; (2) the Counsel for Discipline failed to provide notice of the complaint in accordance with Neb. Ct. R. of Discipline 8, thereby denying to Rokahr due process of law; (3) the finding that Rokahr backdated the perpetual easement is not supported by clear and convincing evidence and is contrary to law; (4) the finding that Rokahr colluded with her client, Allen, in fraudulent conduct by preparing and filing the easement is not supported by clear and convincing evidence and is contrary to law; (5) the finding that Rokahr engaged in delay, deceit, and deception by failing to timely deliver particular deeds is not supported by clear and convincing evidence and is contrary to law; (6) the findings "are wrong as a matter of law in grafting any fiduciary duty of the client-trustee onto ethical duties of the attorney for the trustee"; and (7) the recommended sanction is "overly harsh and disproportionate to the alleged wrong."

## STANDARD OF REVIEW

A proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee; provided, however, that where the credible evidence is in conflict on a material issue of fact, the court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. Counsel for Dis. v. Mills, ante* p. 57, 671 N.W.2d 765 (2003).

Disciplinary charges against an attorney must be established by clear and convincing evidence. *Id.*

## ANALYSIS

### SOUTH DAKOTA DISCIPLINE

In her first exception to the referee's report, Rokahr argues that since the charges pertain to events that took place in South Dakota, and given that she has already been disciplined by South Dakota with respect to this conduct, further discipline by Nebraska "disrespects South Dakota jurisdiction and sovereignty; disregards principles of due process, full faith and credit, collateral estoppel, res judicata; and generally overreaches the proper boundaries of Nebraska jurisdiction." Brief for respondent at 10. The South Dakota discipline to which Rokahr refers is a letter of admonishment issued by the Disciplinary Board of the State Bar of South Dakota on December 20, 2002, criticizing Rokahr for "acced[ing] to Allen's directions/instruction too readily" and "fail[ing] to exercise independent professional judgment." Although Rokahr's assignment of error is expansive, her argument covers the equivalent of one page in her brief. It is difficult to discern the precise basis of Rokahr's argument other than the claim that the Nebraska disciplinary proceeding offends full faith and credit. We will focus our analysis accordingly.

This court has, on occasion, sanctioned attorneys who had already been disciplined by the state in which the ethical violation occurred. See, *State ex rel. NSBA v. Gallner*, 263 Neb. 135, 638 N.W.2d 819 (2002) (following imposition of 6-month suspension in Iowa, formal charges in Nebraska based on same conduct resulted in 1-year suspension); *State ex rel. NSBA v. Frederiksen*, 262 Neb. 562, 635 N.W.2d 427 (2001) (following issuance of public reprimand in Iowa, formal charges in Nebraska based on same conduct resulted in 3-year suspension). Such does not offend the principles of full faith and credit. *Kentucky Bar Ass'n v. Signer*, 533 S.W.2d 534 (Ky. 1976), succinctly analyzes such notion.

In *Signer*, the respondent attorney, Signer, had been admitted to the Ohio bar in 1958 and, after having practiced law in Ohio for more than 5 years, applied for admission to the Kentucky bar without examination. The application was approved, and Signer was admitted to the Kentucky bar in 1966. Thereafter, the Kentucky

Bar Association instituted proceedings to disbar Signer based upon his 1972 disbarment by the Ohio Supreme Court for conduct in Ohio. The Kentucky "trial committee" responsible for determining the effect of Signer's Ohio conduct on his fitness to practice law in Kentucky concluded that the Full Faith and Credit Clause of the U.S. Constitution required that Signer be disbarred or suspended in Kentucky. Rejecting such conclusion and remanding the matter back to the committee, the Kentucky Supreme Court stated:

> The action of the Supreme Court of Ohio in barring Signer from the practice of law in Ohio did not purport to affect his right to practice law in any other state, and could not validly have done so anyway. The Full Faith and Credit Clause cannot possibly be twisted into giving to the Ohio action an effect it did not purport to have. The Ohio court ruled that Signer cannot practice in Ohio. The fundamental requirement of full faith and credit is merely that every other state recognize that he cannot practice in Ohio, and of course we recognize that.
>
> It is conceivable, for example, that under the prevailing standards of one state a lawyer could be disbarred for expectorating on a public sidewalk, whereas in another the rigors of professional discipline might be somewhat less severe. What might suffice to justify disbarment in Ohio might not suffice here. Unlike a marital status, for example, which involves the same two people wherever they may be, the right to practice law does not involve the same two parties from state to state. It involves the individual person on the one hand and the individual state in which he claims the right to practice on the other. The status existing between the two cannot, of itself, determine the status of the same individual person and another state.

*Signer*, 533 S.W.2d at 536.

We agree with the Supreme Court of Kentucky's analysis of the Full Faith and Credit Clause and determine that Rokahr's first exception to the referee's report is without merit.

## NOTICE

Rokahr's second assignment of error alleges in substance that the Counsel for Discipline failed to provide her with proper notice

and an opportunity to respond as required by rule 8(B)(2) and Neb. Ct. R. of Discipline 9(D) and (E). Rokahr contends that the Counsel for Discipline's failure to provide her with notice violates due process, requiring dismissal of the formal charges. In order to adequately analyze Rokahr's assignment of error, we find it necessary to set out in some detail the disciplinary procedure ultimately leading to the filing of formal charges.

Before beginning our analysis, we first note that in their respective briefs, Rokahr and the Counsel for Discipline focus much of their argument on whether certain letters are "grievances" under the disciplinary rules. The term "grievance," however, was not part of the disciplinary rules of the Code of Professional Responsibility until February 2001, and the relevant time period during which the letters at issue were written spans from March 1999 to March 2000. We will therefore limit our analysis to the disciplinary rules in effect at the relevant times.

The record indicates that Mary Frances and Arlene each wrote to the Counsel for Discipline expressing their respective concerns with Rokahr's conduct. The first to complain was Mary Frances. In a letter to the Counsel for Discipline dated March 23, 1999, Mary Frances focused on aspects of Rokahr's conduct she believed to demonstrate a conflict of interest. In compliance with rules 8(B)(2) and 9(D), the Counsel for Discipline furnished a copy of Mary Frances' complaint to Rokahr, to which Rokahr responded on April 7. Upon reviewing Rokahr's response, the Counsel for Discipline, finding no evidence of a conflict of interest, dismissed the complaint. The Counsel for Discipline notified Mary Frances of the dismissal in a letter dated April 27, 1999.

However, Rokahr contends a letter received by the Counsel for Discipline the day prior to the dismissal of the Mary Frances complaint, as well as two letters received by the Counsel for Discipline thereafter, should have been furnished to her. Having received these three letters "only in discovery after the Formal Charges were filed," brief for respondent at 13, Rokahr contends that the disciplinary rules were violated and that she was denied due process in these proceedings. We therefore turn our attention to these three letters.

The first letter Rokahr claims should have been furnished to her was written by Mary Frances and received by the Counsel for

Discipline on April 26, 1999, the day preceding the dismissal of Mary Frances' complaint. Our de novo review of the April 26 letter, however, reveals that it was written by Mary Frances to "rebut" Rokahr's rule 9(E) response to the Counsel for Discipline. Under the definitions section of the disciplinary rules of the Code of Professional Responsibility in effect at the relevant time, a complaint was defined as "[a]ny written statement made by any person alleging conduct on the part of a member which, if true, would constitute a violation of the member's oath or the Code." That the Mary Frances rebuttal did not meet the definition of a complaint, and thus require a copy to be furnished to Rokahr pursuant to rule 9(D), is clearly evidenced by the Counsel for Discipline's April 27 letter. In that letter, the Counsel for Discipline notifies Mary Frances that notwithstanding "your recent reply . . . I have dismissed your complaint." Upon our de novo review, we determine that the April 26 letter did not allege additional conduct constituting a violation of the Code of Professional Conduct. As such, the letter was not a complaint, and rules 8(B)(2) and 9(D) did not require the Counsel for Discipline to furnish a copy of the letter to Rokahr.

The second letter Rokahr argues should have been furnished pursuant to rules 8(B)(2) and 9(D) was also written by Mary Frances to the Counsel for Discipline and dated May 24, 1999. In that letter, Mary Frances questions the Counsel for Discipline's decision to dismiss her complaint. Here again, however, our de novo review of the record shows that despite this May 24 letter, the Counsel for Discipline's initial determination to dismiss Mary Frances' complaint did not change. Simply put, the May 24 letter does not meet the definition of a complaint, and the Counsel for Discipline was not required by rules 8(B)(2) and 9(D) to furnish a copy of the letter to Rokahr.

The final letter Rokahr directs our attention to is dated March 20, 2000, and written by Arlene to Richard T. Seckman, Chair of the Committee on Inquiry of the Third Disciplinary District. In that letter, Arlene notified Seckman of her desire to appeal an earlier determination by the Counsel for Discipline not to investigate Arlene's specific allegations of misconduct by Rokahr. Our de novo review of the record shows this letter is nothing more than a "notice of appeal" to the Committee on Inquiry and

does not meet the definition of a complaint. See Neb. Ct. R. of Discipline 14(A) (rev. 1996). Under such circumstance, rules 8(B)(2) and 9(D) did not require the Counsel for Discipline to furnish a copy of the letter to Rokahr.

In her brief, Rokahr does not argue that the formal charges filed against her were in any way defective, that she was not adequately notified of the actual charges she was to defend against at the hearing before the referee, or that she was denied due process at that hearing. Rokahr's argument is that three specific letters were not furnished to her as required by the disciplinary rules and that such failure denied her due process. Having determined from our de novo review of the record that the three letters were not complaints and were therefore not required to be furnished, Rokahr's second assignment of error is without merit.

## EASEMENT

In her third and fourth assignments of error, Rokahr argues the referee's finding that she backdated the easement and colluded with Allen in its preparation and filing are not supported by clear and convincing evidence and are contrary to law.

Upon its face, the easement reflects that it was signed by Allen and Marilyn on September 1, 1994, notarized by Rokahr on that same date, and filed with the register of deeds for Yankton County on March 6, 1995. The Counsel for Discipline, however, contends the easement was actually signed and notarized sometime in late February or early March 1995, at a time when Paula's and Rebecca's trusts had terminated and Allen no longer had the legal authority to act on their behalf. The motivation, as contended by the Counsel for Discipline, was for Allen to perpetually secure, for his children, ingress and egress via the East Larson ground to the West Larson ground which would otherwise be "landlocked." The referee found the Counsel for Discipline's contention was supported by clear and convincing evidence.

In support of his finding, the referee relies on three principal factors. The first factor is Rokahr's appointment calendar, which makes no mention of a meeting with Allen and Marilyn to sign the easement in September 1994. Second, the referee points to a February 22, 1995, letter to Allen from Rokahr. That letter, dated 1 day after Rebecca's trust had terminated and 5 months after the

termination of Paula's trust, provides in relevant part: "Please find enclosed a copy of the Perpetual Easement . . . on the parcel of land in Yankton County . . . . *If this is acceptable, please let me know and we can make arrangements for its signing.*" (Emphasis supplied.) Finally, the referee relies on Rokahr's billing records. A review of those records indicates that Allen was billed for the preparation and signing of an easement on March 15.

Evidence purporting to support Rokahr's contention that the easement was signed on September 1, 1994, consists principally of Rokahr's testimony and the testimony of Allen and Marilyn. At the hearing before the referee, Rokahr testified:

> [Counsel for Discipline:] . . . Did you witness Marilyn and Allen Heine sign the original easement on September 1, 1994?
>
> [Rokahr:] I don't recall.
>
> . . . .
>
> Q Do you have any documentation to substantiate your belief that you saw them execute this document on September 1st, 1994?
>
> A I would look to this document itself as proof that it was in fact signed before me on this date . . . .

Allen testified that to "the best of my knowledge according to the records I can find, I signed it the 2nd of September [1994]." Marilyn's testimony is at best equivocal:

> [Counsel for Discipline:] When did you sign it?
>
> [Marilyn:] I'm not even going to say a date because all I remember is that it was in the latter part of July, I'm going to say, or the middle part of July when my husband did talk to me about the fact that they were going to probably prepare an easement and that there would be an easement prepared. And I'm going to say it was, you know, probably any time within the next 30 days that I signed it. It was shortly afterwards and I'm not going to say it was ten days or twenty days, I'll just say it was sometime within the 30 day period.

By way of further explanation, Rokahr testified that on or about September 1, 1994, she was in the midst of a 3-day trial. Rokahr contends that it may be due to this trial that she does not specifically recall when Allen and Marilyn signed the easement

or why the easement was not filed until March 6, 1995. Rokahr also testified that she suspected, though did not know for certain, that upon later perusal of the Heine file, she found a "draft" of the easement, and not realizing that the easement had already been signed by Allen and Marilyn on September 1, 1994, prepared and sent the February 22, 1995, letter to Allen to arrange for its signing. As for her billing records not reflecting a charge for the preparation of the letter and easement until March 15, 1995, Rokahr blamed poor billing practices.

Rokahr cites *Stokes v. Rabenberg*, 227 N.W. 466 (S.D. 1929), to support her legal argument that "[t]he acknowledgement itself is proof of the events. . . . Acknowledgment by respondent that she cannot remember all or any part of the transaction is no contradiction of the facts established prima facie by acknowledgement of the easement." Brief for respondent at 15. However, *Stokes* is distinguishable, since the testimony of the notary in *Stokes* was not impeached. Here, we are presented with evidence impeaching the date Rokahr, as notary, acknowledged the easement's execution.

Rokahr testified that she was aware Paula was entitled to the assets of her trust on September 18, 1994, and that Allen wanted the easement over the East Larson ground in place before that date. As such, Rokahr knew that in backdating the easement, she would be aiding Allen in an effort to exert control over property at a time when Allen no longer had legal authority to act on behalf of Paula or Rebecca. Upon our de novo review of the record, giving weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another, we determine that clear and convincing evidence exists to support the referee's finding that Rokahr backdated the easement and colluded with Allen in its preparation and filing. Rokahr's third and fourth assignments of error are without merit.

### DELAY IN DELIVERY OF DEEDS

In her fifth assignment of error, Rokahr argues the referee's finding that she engaged in delay, deceit, and deception in the delivery of Paula and Rebecca's deeds is not supported by clear and convincing evidence and is contrary to law.

In finding that Rokahr engaged in delay, deceit, and deception, the referee relied primarily on correspondence between Rokahr and William Klimisch, an attorney retained by Arlene and Leon to represent them in their attempt to resolve disputes surrounding the trusts. The referee found that this correspondence demonstrated Rokahr was aware of Allen's obligation to deed the Gust and East Larson grounds to Paula on September 18, 1994, and to Rebecca on February 21, 1995, yet continually failed to do so even after specific requests from Klimisch.

The record, however, contains conflicting evidence as to precisely when the deeds to the Gust and East Larson grounds were delivered to Paula and Rebecca. Rokahr produced evidence indicating that all deeds were hand delivered to Klimisch on April 24, 1995. Arlene, however, testified that Paula and Rebecca did not receive their East Larson deeds until March 17, 1997, when Arlene picked the deeds up from Rokahr's office.

The record contains evidence supporting Rokahr's contention that the deeds for both the Gust and East Larson grounds were delivered to Klimisch on April 24, 1995. Copies of Rebecca's deeds to the Gust and East Larson grounds contain handwritten notations made by Rokahr's secretary that read: "original given to Klimisch 4/24." Moreover, both Paula's and Rebecca's deeds to the Gust ground were filed with the register of deeds for Cedar County on April 27, 3 days after Rokahr contends all the deeds were delivered to Klimisch.

In addition, the correspondence between Rokahr and Klimisch subsequent to April 24, 1995, does not contain any evidence clearly and convincingly disputing Rokahr's contention. To the contrary, in a letter to Klimisch dated April 25, 1995, 1 day after Rokahr asserts all the deeds were delivered, Rokahr wrote to Klimisch, stating: "Hopefully by now you should have received the deeds transferring the land, which was as [sic] asset of the Rebecca and Paula Heine Trusts, to Rebecca and Paula." Klimisch, the only person who could have directly contradicted Rokahr's contention regarding the delivery of the deeds, did not testify. In our de novo review of the record on this disputed fact, we are unable to conclude that the evidence clearly and convincingly shows that the deeds were not delivered on April 24, 1995, as Rokahr contends.

In concluding that the record supports Rokahr's contention that all deeds were delivered on April 24, 1995, we are mindful that delivery on April 24 still resulted in a delay of 2 months from the date Rebecca's trust terminated and 7 months from the date Paula's trust terminated. However, upon our de novo review of the record, we are unable to conclude that the evidence clearly and convincingly shows this delay was the result of deceitful or misleading conduct by Rokahr.

The record discloses the establishment of eight individual trusts, with conveyances to those trusts made over a span of approximately 9 years. Rokahr had no involvement in drafting either the trusts or the initial deeds which transferred land in Nebraska and South Dakota to those trusts. Rather, Rokahr's involvement began in January 1994, when she was retained by Allen to assist with the closing of Paula's trust which was scheduled to terminate on September 18, 1994.

The record is undisputed that significant problems regarding these trusts required Rokahr's attention. First, as noted above, the trusts were funded over a period of 9 years, with fractional interests in several different properties. For at least three of these properties, deeds had been drafted conveying more than 100 percent of the real estate to the benefiting trust. For example, as of December 23, 1981, all of the East Larson ground had been deeded to Allen as trustee. However, on December 31, 1982, Alphonse and Clara attempted to transfer an additional one-half interest in that same property to Allen as trustee. Also, a total of twenty-nine twentieths of the West Larson ground was transferred for the benefit of Allen's children to Leon as trustee. Finally, a total of thirty-seven thirtieths of the Wueben pasture was transferred to Allen as trustee.

Second, the initial deeds conveying property to the trusts did not include an ascertainable trust beneficiary. This, according to the unrefuted opinion of Rokahr's expert, rendered the deeds "insufficient to convey property" in South Dakota. Not only did this omission bring the legality of the conveyances into question, it is supportive of Rokahr's contention that (1) there was uncertainty regarding the grantor's intent with respect to the East Larson ground and (2) it was this uncertainty, and not deceit, that caused the delay in delivering Paula's and Rebecca's deeds.

Finally, other factors contributed to the confusion surrounding these trusts. First, the profits from the rental income on the Wueben pasture, the Gust ground, and the East Larson ground historically had been deposited into one account and divided equally between Paula, Rebecca, and Justin. Such conduct is supportive of Allen's view that Justin was to have a share of the East Larson ground and Rokahr's drafting of the corrective warranty deeds purporting to convey such interest. Also, in the initial letter written from Klimisch to Rokahr, Klimisch indicated he represented Leon and Arlene "and their minor children." At that time, however, Justin was Leon and Arlene's only minor child. Rokahr claims that this letter led to confusion and delay in her responses to Klimisch as it was necessary for Rokahr to clarify with Paula and Rebecca who precisely Klimisch was representing.

In our de novo review of the record, we acknowledge there is evidence which lends support to the referee's finding that Rokahr engaged in deceit with respect to the delivery of Paula's and Rebecca's deeds. The issue, however, is whether on balance, such evidence can be said to produce in the trier of fact a firm belief or conviction about the existence of the fact to be proved. See *State ex rel. Special Counsel for Dis. v. Shapiro*, 266 Neb. 328, 665 N.W.2d 615 (2003). Given the disputed facts on this question, together with the legal issues Rokahr confronted due to the manner in which the trusts were drafted and the deeds prepared, we cannot conclude that the evidence produces a firm belief or conviction that Rokahr's conduct was deceitful.

### GRAFTING OF ETHICAL AND FIDUCIARY DUTIES

In her sixth assignment of error, Rokahr argues that the referee erred in "grafting" the fiduciary duty of the trustee onto the ethical duties of an attorney for the trustee. As we read Rokahr's argument, she contends that the duty to deliver the deeds to Paula and Rebecca was Allen's and that as a result, she cannot be held responsible for Allen's failure to deliver the deeds in a timely manner.

Having concluded there was not clear and convincing evidence to support a finding that Rokahr had engaged in delay, deceit, and deception in the delivery of the deeds to Paula and Rebecca, we need not address this assignment of error.

## RECOMMENDED SANCTION

In her seventh and final assignment of error, Rokahr argues that the referee's recommended sanction is "overly harsh and disproportionate to the alleged wrong."

To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, the Nebraska Supreme Court considers the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the respondent generally, and (6) the respondent's present or future fitness to continue in the practice of law. *State ex rel. Counsel for Dis. v. Mills, ante* p. 57, 671 N.W.2d 765 (2003). Each attorney discipline case must be evaluated individually in light of its particular facts and circumstances. *Id.* For purposes of determining the proper discipline of an attorney, this court considers the attorney's acts both underlying the events and throughout the proceeding. *Id.*

Rokahr's conduct in her representation of Allen is troubling. In the course of this representation, Rokahr backdated the easement over the East Larson ground, thus assisting Allen in breaching his fiduciary duties as trustee. Moreover, when Rokahr filed the easement with the register of deeds for Yankton County, she knew it to be backdated and false.

In determining an appropriate sanction under Neb. Ct. R. of Discipline 4 (rev. 2001), we may consider any of the following as sanctions for attorney misconduct: (1) disbarment; (2) suspension for a fixed period of time; (3) probation in lieu of suspension, on such terms as the court may designate; (4) censure and reprimand; or (5) temporary suspension. *Mills, supra.* The propriety of a disciplinary sanction must be considered in reference to the sanctions imposed by this court in prior cases presenting similar circumstances. *State ex rel. NSBA v. Gallner,* 263 Neb. 135, 638 N.W.2d 819 (2002).

In *State ex rel. Nebraska State Bar Assn. v. Butterfield,* 169 Neb. 119, 98 N.W.2d 714 (1959), Butterfield represented clients in a real estate transaction. The referee found that during a subsequent proceeding to set aside a deed involved in that transaction, Butterfield falsely testified that one of the signatures on the deed was not acknowledged before him. The referee further found that

although the acknowledgment had occurred on or before June 7, 1956, Butterfield postdated the acknowledgment to January 2, 1957. The referee concluded that Butterfield had improperly postdated the deed and the acknowledgment and had given false testimony to a court of law. We suspended Butterfield for 6 months.

In *Mills, supra,* this court was presented with an attorney representing the personal representative of an estate. We concluded that Mills had engaged in several acts of misconduct, including (1) falsely acknowledging documents despite failing to witness the signatures of those signing, (2) altering the dates those documents were actually signed, (3) filing those false documents with the county court and the register of deeds, (4) filing a federal estate tax return based on those false documents, (5) lying to the Internal Revenue Service with respect to his representation of the estate, and (6) encouraging his client to aid in his deception by lying to the Internal Revenue Service. We suspended Mills for 2 years.

Before imposing a disciplinary sanction, we must also consider any mitigating factors present. *Mills, supra.* We thus note, as mitigating factors, the various affidavits and testimony expressing support for Rokahr and attesting to her commitment to the legal profession and her involvement in the community.

Rokahr's actions in colluding with her client to backdate the easement over the East Larson ground and then filing that false document with the register of deeds for Yankton County are serious. However, we do not feel these actions rise to the level of the misconduct in *State ex rel. Counsel for Dis. v. Mills, ante* p. 57, 671 N.W.2d 765 (2003), because the record does not reflect that Rokahr elicited the aid of any person in an effort to perpetuate the deception surrounding the preparation and filing of the easement. Nevertheless, we believe Rokahr's conduct merits more than the 6-month suspension recommended by the referee. Thus, upon our de novo review of the record, this court determines that Rokahr should be suspended from the practice of law for a period of 1 year.

## CONCLUSION

Rokahr's exceptions to the referee's report are sustained in part, and in part overruled. Rokahr is hereby suspended from the

practice of law for a period of 1 year. Rokahr is directed to comply with Neb. Ct. R. of Discipline 16 (rev. 2001), and upon failure to do so, she shall be subject to punishment for contempt of this court. Rokahr is directed to pay costs and expenses in accordance with Neb. Rev. Stat. §§ 7-114 and 7-115 (Reissue 1997).

JUDGMENT OF SUSPENSION.

GERRARD, J., not participating.